## Judy DIFFEE *v.* STATE of Arkansas

CR 94-905

894 S.W.2d 564

Supreme Court of Arkansas
Opinion delivered March 6, 1995

*William R. Simpson, Jr.*, Public Defender, by: *C. Joseph Cordi, Jr.*, Deputy Public Defender, for appellant.

*Winston Bryant*, Att'y Gen., by: *Brad Newman*, Asst. Att'y Gen., for appellee.

JACK HOLT, JR., Chief Justice. The appellant, Judy Diffee, was found guilty of first-degree murder in the killing of her mother, Edith Durham, and was sentenced to a forty-year term of imprisonment. She raises the following three points for reversal: (1) that the trial court erred in admitting testimony that she

had attacked her former husband in an unrelated incident; (2) that the trial court's application of Act 535 of 1993 (Arkansas's new bifurcated sentencing laws) to her trial violated the prohibition against *ex post facto laws* found in the federal and state constitutions; and (3) that the trial court erred in allowing the State to elicit speculative testimony. Finding merit in her first argument, we reverse and remand.

*Facts*

Appellant Judy Diffee claims that she discovered the body of her mother, Edith Durham, on a couch in the living room of Ms. Durham's Little Rock home on the morning of October 16, 1992. Dressed in a nightgown, Ms. Durham had been stabbed in the chest, left arm, and back a total of twenty-two times, and had been struck in the head four times, apparently with an ice pick.

According to the testimony of Melba Combee, Ms. Durham's niece, she received a phone call from Ms. Diffee at approximately 8:15 a.m., at which time she went to her aunt's residence, found her on the couch and Ms. Diffee standing at the back door. After Ms. Combee called 911, Sergeant David Adams of the Pulaski County Sheriff's Office responded to the residence and made contact with Ms. Diffee, who resided in a Morgan-type portable building on the same property, which she gave written consent to search. In the course of searching Ms. Diffee's residence, Detective Terry Ward of the Pulaski County Sheriff's Office advised Sergeant Adams to "keep an eye on [Ms. Diffee]" as "she put something in her purse" while she was in her building. Sergeant Adams then followed Ms. Diffee as she walked to a barn on the property, where he observed her take an object from her purse and put it into a box. He stated that, when Ms. Diffee recognized that he had followed her, she exclaimed, "Well, I wouldn't hurt my mother on purpose." When Sergeant Adams looked in the box, he observed several trophies, among which was an ice pick. He then placed Ms. Diffee under arrest and transported her to the sheriff's department.

On January 21, 1993, the Prosecuting Attorney for the Sixth Judicial District filed an information charging Ms. Diffee with first-degree murder. Thereafter, the State filed a motion to admit evidence that Ms. Diffee had assaulted her former husband, Eddie Diffee, with an ice pick in 1989, and at a pre-trial hearing on

January 18, 1994, after hearing testimony from Mr. Diffee as well as arguments from counsel, the trial court ruled, over Ms. Diffee's objection, that Mr. Diffee's testimony was admissible.

At trial, Dr. Frank Peretti, Associate Medical Examiner for the State Crime Lab, testified that, upon performing the autopsy, he determined that the manner of death was homicide, and that there were twenty-two stab wounds on Ms. Durham's body which were consistent with being inflicted by an ice pick, none of which were defensive. He further observed four contusions or bruises under Ms. Durham's scalp, which he also stated could be consistent with being inflicted with an ice pick. Lisa Calhoun, a forensic seronologist with the State Crime Lab, testified that she tested the ice pick for blood with negative results; however, she stated that if the ice pick had been washed or cleaned thoroughly, that would explain the negative test results. This testimony was corroborated by Roger Swope, a crime-scene specialist with the City of Little Rock, who performed luminol testing on the ice pick and also received negative results for blood.

Ms. Diffee's son, Scott Diffee, testified that he had observed tension and hostility between his mother and grandmother, and, particularly, that he had seen his mother "jump up and knock tables over" and "go straight towards [Ms. Durham] like a football player hitting another football player." Approximately two weeks before the murder, he stated that he went out to his grandmother's residence to "calm everyone down" when his mother and grandmother were having an argument. Ms. Diffee's eldest son, Mark Diffee, testified that he and Scott moved into his grandmother's residence after her death and stayed there until Ms. Diffee was released on bail and returned to the residence. He stated that, on one occasion, he went back to the residence to get some clothes and a cable box that Scott had asked him to retrieve. While he was removing the box from the television, Ms. Diffee, who did not want him to take it, got on top of him, and hit him a couple of times before saying that, "I'll do you like I did Granny." Mark then got his clothes and the cable box and left the residence.

Bonnie England, an acquaintance of Ms. Diffee and Ms. Durham, testified that, on the night before Ms. Durham's body was discovered, she had spoken with her on the telephone and

had heard her arguing with Ms. Diffee over going to get some ice cream, and specifically heard Ms. Diffee say to her mother, "I wished you was dead." Ms. England further testified that one week prior to the incident, she had observed black and blue spots all over Ms. Durham's neck, and that Ms. Durham explained to her that her daughter had knocked the breath out of her and had hit her on a goiter on her neck. Witnesses also offered that Ms. Diffee and her mother argued over Ms. Diffee's prescription drugs, which her mother would keep, as she would try to dispense the correct dosage to her daughter. Additionally, according to Ms. Combee, who was also executor of Ms. Durham's estate, Ms. Durham planned to change her will so that Ms. Diffee and her two sons would take equal shares in the estate, rather than Ms. Diffee having a life estate in the will's present form. She further testified that Ms. Durham, whose purse was found in her daughter's building on the morning the body was discovered, would have never let Ms. Diffee have her purse, and that her car, which she would routinely park in the same spot and which she always kept clean, was found moved and littered.

Ms. Diffee testified in her own behalf, denying any violence toward her former husband or her mother. On cross-examination, she admitted giving Sergeant Adams two different reasons for hiding the ice pick — that she had been in prison and that she was scared, and that she was trying to hide it for one of her sons, implying that one of them may have committed the homicide.

Ms. Diffee's trial was bifurcated pursuant to Arkansas's new bifurcated sentencing procedures, and after the jury found her guilty as charged, they heard evidence of Ms. Diffee's prior convictions as well as victim impact testimony, and recommended that she be sentenced to a forty-year term of imprisonment. The trial court entered judgment against her, and it is from this adverse ruling that Ms. Diffee appeals.

*I. Admissibility of prior bad acts under A.R.E. 404(b)*

Ms. Diffee argues that the trial court erred in admitting evidence that she had attacked her former husband, Eddie Diffee, and that this testimony should have been ruled inadmissible under Arkansas Rules of Evidence 404, but before we examine the issue on its merits, we must first determine whether Ms. Diffee properly preserved this matter for appeal.

Prior to trial, the State filed a formal motion seeking to admit the testimony of Eddie Diffee under A.R.E. 404, and for the admission of a statement allegedly made by Ms. Diffee to her ex-husband under A.R.E. 801, to which Ms. Diffee objected. (The A.R.E. 801 request is a non-issue, as the statement sought to be admitted under this rule was never presented at trial.) Although the State, in its brief, concedes that Ms. Diffee's A.R.E. 404(b) objection was preserved for appeal, the dissenting opinion in this case ignores the State's concession and declares to the contrary.

The dissent points out that Ms. Diffee did not articulate her objection to Eddie Diffee's testimony under A.R.E. 404(b); rather, she questioned its sufficiency, and, as such, her objection was not specific enough to apprise the trial court of the specific error in question. *Scroggins* v. *State*, 312 Ark. 106, 848 S.W.2d 400 (1993). The dissent is correct in part, as Ms. Diffee's objection was not specific. Yet, the dissent makes little of the fact that the trial court considered and admitted Mr. Diffee's testimony under this rule in direct response to the State's formal motion to admit his testimony. Granted, Ms. Diffee's concern at the pre-trial hearing went to the question of the sufficiency of Eddie Diffee's testimony; however, the fact still remains and the record reflects that the trial court was well-apprised of the issues of admissibility, as is noted in the court's response to Ms. Diffee's objection to the testimony that "[w]e're talking about whether or not it's admissible, not whether or not it's something you cannot or can attack at trial, you know."

In short, the trial court considered Mr. Diffee's testimony pursuant to the State's request to admit it into evidence under A.R.E. 404(b), and wrongfully permitted it at trial. That rule provides in pertinent part as follows:

(b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, and acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The significant facts surrounding the evidence are these.

Eddie Diffee testified that he and Ms. Diffee were married from 1967 until 1991, and that one evening in 1989, he was sleeping on his left shoulder in the front bedroom of their home with his right hand out from underneath the cover, when he swiped and hit something which fell out of Ms. Diffee's hand and to the floor. According to Mr. Diffee, the object cut three fingers on his hand and stuck him between his sideburn and eye. He further testified that Ms. Diffee screamed and ran through the foyer and living room to the kitchen, where she told him that a man had run through their house. Mr. Diffee then cleaned the blood off his fingers and face and went to work, as he was employed on the midnight shift at Jones Truck Line. The next morning, he came home from work to find Ms. Diffee asleep on the bed and an ice pick laying on the floor on the same side of the bed where he had knocked the object out of her hand the night before.

Ms. Diffee characterizes the alleged attack of her former husband as an "unrelated incident." In light of the facts before us, we must agree. Granted, evidence which shows a method of operation is independently admissible; however, the evidence in this case does not reach that level.

There are two requirements for introducing evidence of an unrelated prior act to show a method of operation: "(1) both acts must be committed with the same or strikingly similar methodology; and (2) the methodology must be so unique that both acts can be attributed to one individual." *Frensley* v. *State*, 291 Ark. 268, 274, 724 S.W.2d 165, 169 (1987) (citing Edward J. Imwinkelried, *Uncharged Misconduct Evidence*, § 3.10 to 3.12 (1984). This case fails both requirements.

The first requirement is that there be a very high degree of similarity between the charged crime and the prior uncharged act. Professor Imwinkelried describes this first requirement as follows:

> The courts have repeatedly held that the degree of similarity required to establish identity based on modus operandi is greater than the degree required to negate innocent intent. The courts have contrasted the two theories by saying that the identity theory requires "a high degree of similarity," a "strict" degree, a "higher" degree, a "greater" degree, or a "much greater" degree of similarity. The requirement for

greater similarity is justified. When the prosecutor is offering the defendant's similar acts to disprove innocent intent, the doctrine of chances operates so long as the acts are of the same general category. However, when the prosecutor offers acts for the purpose of proving the defendant's identity, proof of acts of the same category or type is insufficient; in the words of Lord Widgerly, proof of acts in the same generic type is insufficient to support a permissive inference that the acts were performed by the "same" person.

Edward J. Imwinkelried, *Uncharged Misconduct Evidence* § 3.11 at 23 (1984) (footnotes omitted).

In this case the unrelated and uncharged prior act was that Eddie Diffee, who was Ms. Diffee's husband at the time, was asleep in their home and while moving his hand from underneath the cover, hit an ice pick and knocked it from her hand. He cut three fingers as he moved his hand from underneath the covers, and the ice pick stuck him between his sideburn and eye. In the charged act, the victim, Ms. Diffee's mother, was stabbed twenty-two times in the body and struck four times in the head. The weapon was most likely an ice pick. Her body was found on a couch in her residence, which was adjacent to the building in which Ms. Diffee lived.

The two acts were similar because both acts involved an ice pick, both involved Ms. Diffee preparing to attack or attacking a member of her family, and both occurred in or near Ms. Diffee's residence. It is doubtful that there was a "high degree" of similarity, but even if there were, this case clearly fails the second requirement.

The second requirement for admission as a method of operation is that the methodology be so unique that it independently identifies the accused as the perpetrator. Professor Imwinkelried describes this requirement as follows:

Standing alone, proof of similarity of the two crimes is insufficient to justify admitting the uncharged misconduct to prove the defendant's identity. Even if the crimes are identical, it just may happen that every safe robber or counterfeiter is familiar with that technique. Before admit-

ting the evidence to prove the defendant's identity, the judge must conclude that the crimes were committed by "one and the same person."

The courts and commentators have used various expressions to describe the requirement that the methodology be attributable to only one criminal: The methodology must be "bizarre," "highly characteristic," "distinguishing," "distinctive," "dramatic(ally) similar," an "earmark," "exceptional," a "fingerprint," a "handiwork," "identifying," "idiosyncratic," "novel," "parallel," "peculiar," "remarkably similar," "set apart," "signature quality," "singular," "strikingly similar," "a veritable trademark," "uncommon," "unique," or "unusual."

Imwinkelried, *supra* § 3.12 (1984) at 26 (footnotes omitted).

In this case, Mr. Swope, the crime scene specialist, testified that he had seen several homicides that had involved the use of ice picks. The uncharged act did not involve a stabbing, so there is nothing unique about the locations of the stab wounds or the manner of stabbing. In short, the methodology did not set apart the perpetrator. To be admissible, the method of operation must so set apart the perpetrator that it independently discloses the criminal's identity. Professor Imwinkelreid states:

There are numerous, excellent hypothetical and actual examples of unique methodology.

The hypothetical examples are more colorful. Professor Alan Polasky of the University of Michigan hypothesized the bandit with the silver crossbow. The British examples are just as histrionic; criminals who repeat a particular humorous limerick or who wear the ceremonial headdress of an Indian chief. More recently, Professors Broun and Meisenholder have given us the example of the robber wearing the medieval knight's helmet. The point of each hypothetical is to illustrate the required standard of uniqueness.

There are several illustrations drawn from actual cases that are equally good examples of the standard. The courts have admitted evidence of other crimes to establish a one-of-a-kind modus operandi in the following cases: The bur-

glar always left a bathroom scale on the front door of the burgled residence; the drug trafficker sold a type of white heroin rare in the San Antonio area; the killer always shot the victim in the back near the fourth cervical vertebra; the thief used a rare automobile to make his getaway; the forged money orders were identical in amount, payee, and payer and sequential in number; the burglaries were committed after the burglar bypassed the alarm system in a sophisticated, distinctive manner; the bank robber wore rose-tinted wire-framed glasses and a certain color shirt and wig; the caller making the phone threat always mentioned a "Mary D" during the call; and the smugglers used the same ingenious stratagem even though on one occasion the smuggled contraband was drugs but on the other occasion the contraband was a handgun. In these cases, although the crimes may not have been identical in every detail, the crimes were sufficiently similar and the modus sufficiently unique to justify admitting the uncharged misconduct evidence to show identity.

Imwinkelreid, *supra* § 3.13 at 31 (footnotes admitted).

*Frensley* is a good example of the proper admission of prior unrelated acts to show the accused's method of operation. There we held that the prior acts were admissible because:

[T]he methodology uniquely sets apart and identifies appellant as the robber. The similarities include the robbery of Long John Silver's restaurants, the time of entry, the place of seating, the long stay in the restroom, the knowledge of the layout of the restaurants, the use of a dark colored revolver, the use of tape, the wearing of long jersey work gloves, and the physical appearance of the robber. Both actions were committed in the same unique fashion. Further, the two acts were so unique and uncommon that they became distinctive and identifying. The two acts establish a method of operation. The inference is clear, there were not two different robbers. The evidence was properly admitted.

*Frensley*, 291 Ark. at 274, 724 S.W. 2d at 169.

In sum, to be admissible, the two related acts must be so distinctive, so unique, and so uncommon that they become

identifying, and they must be independently relevant to show a method of operation. The unrelated acts in this case do not reach such a level.

Another theory advanced by the State is that Mr. Diffee's testimony was properly admitted to show Ms. Diffee's "intent, plan, and identity" in light of our decision in *Brenk* v. *State*, 311 Ark. 579, 847 S.W.2d 1 (1993). The appellant in *Brenk* was charged with capital murder in the connection with the death of his wife, Lou Alice Brenk, whose torso was found in a cooler floating in Lake Norfork. The cooler contained cement as well as her torso, which had been severed at the upper thighs and back. At trial, Jackie Brenk, the appellant's former wife, was permitted to testify that he "had threatened her when they were married, had tried to kill her, and had told her he would kill her, cut her body to pieces, and scatter the pieces from Mammoth Springs, Arkansas, to Louisiana so that no one would ever find her." In short, Jackie Brenk's testimony was that Brenk had told her that he would cut her body to pieces and scatter those pieces, and the body of Lou Alice Brenk was so found. Under these circumstances, we held that "[g]iven the similarity of the circumstances of Lou Alice Brenk's death and the specific threats made by appellant to Jackie Brenk, although several years earlier, these threats were admissible to show appellant's 'intent, plan, and identity.'" Conversely, little similarity of circumstances exists in this case. While Eddie Diffee testified that some several years previous, he was cut on three fingers of his hand and stuck between his sideburn and eye when he knocked an ice pick from Ms. Diffee's hand, there was no proof that Ms. Diffee made any specific threats towards her former husband. In fact, she denied being involved in his injury, claiming that it was the result of an attack by a third party.

Although it is apparent that Ms. Diffee may have used an ice pick in an assault on her ex-husband and in stabbing Ms. Durham some twenty-two times in various parts of her body, such use of an ice pick to assault her ex-husband, absent specific threats to him or other evidence of an intent or plan to inflict harm or take his life, simply does not pass muster as permitted evidence under A.R.E. 404(b). The admission of this testimony was prejudicial error for which we must reverse and remand for a new trial.

## *II. Issues upon retrial*

We discuss the other two points of appeal for the guidance of the trial court and counsel on remand, as it is likely that these issues will arise again at a subsequent trial. *See Spring Creek* v. *Sarrett*, 319 Ark. 259, 890 S.W.2d 598 (1995).

### *A. Constitutionality of the bifurcated sentencing proceedings pursuant to Act 535 of 1993*

■■ For her second point of error, Ms. Diffee asserts that Arkansas's bifurcated sentencing procedures in Act 535 of 1993, codified in Ark. Code Ann. §§ 5-4-103 (Repl. 1993) and 16-97-103 (Supp. 1993), under which she was sentenced, are violative of the *ex post facto* clause in the United States Constitution. We recently put this issue to rest in the case of *Williams* v. *State*, 318 Ark. 846, 887 S.W.2d 530 (1994). In *Williams*, we specifically held that:

> Arkansas's new bifurcated sentencing laws do not violate the *Ex Post Facto Clause* because they do not criminalize conduct that was previously non-criminal, do not increase the severity or harshness of the punishment for the offenses [defendant] committed and do not deprive [defendant] of a defense that was available to him at the time he committed the offenses with which he was charged. Statutory changes in the mode of trial or the rules of evidence, which do not deprive the accused of a defense and which operate only in a limited and unsubstantial manner to his disadvantage, are not prohibited. Nor is a statute prohibited which changes the rules of evidence after an indictment so as to render admissible against the accused evidence previously held inadmissible. Because the penalty or sentence authorized under the prior and new sentencing statutes remains the same as applied in [defendant's] situation, we conclude any change was merely procedural and not substantively prejudicial or an *ex post facto* violation.

(Citations omitted.) Ms. Diffee also asserts that the bifurcated sentencing laws violate Art. 2, § 17 of the Arkansas Constitution, yet, like the appellant in *Ridenhour* v. *State*, 305 Ark. 90, 805 S.W.2d 639 (1991), she has failed to present us with any argument showing us why we should interpret the *ex post facto* doc-

trine in the Arkansas Constitution in manner contrary to that of the *ex post facto* clause of the United States Constitution. Thus, Ms. Diffee's argument on this point must fail.

## B. Speculative testimony

 For her final point of error, Ms. Diffee asserts that the trial court erred by allowing the State to elicit the speculative testimony of Melba Combee, Ms. Diffee's cousin, as to whether her aunt, Ms. Durham, would have let Ms. Diffee have her purse, which Ms. Combee discovered in Ms. Diffee's building on the morning the body was found. The testimony in question took place as follows:

> COUNSEL FOR STATE: Would she [Ms. Durham] have let Judy [Diffee] have her purse?
>
> WITNESS: Huh-uh. (no).
>
> COUNSEL FOR DIFFEE: Your Honor, I'm going to object to that question. I think it's hearsay and she's asking the witness to speculate.
>
> THE COURT: Hearsay? Overruled.
>
> COUNSEL FOR DIFFEE: She's asking the witness to speculate.
>
> THE COURT: I don't think it's hearsay at all. Overruled.

Arkansas Rule of Evidence 701 prohibits the admission of speculative testimony. It states as follows:

> Opinion testimony by lay witnesses. — If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are
>
> (1) Rationally based on the perception of the witness; and
>
> (2) Helpful to a clear understanding of his testimony or the determination of a fact in issue.

Stated another way, evidence is "speculative" where it is not helpful to a clear understanding of the testimony or to a determination of a fact in issue. We disagree that Ms. Combee's testimony regarding whether Ms. Durham would have let Ms. Dif-

fee have her purse was speculative, as her opinion was based on a lifetime of observation. Ms. Combee was age 62 and Ms. Durham's niece, and had been around her aunt all her life, observing that she kept her car keys in her purse and guarded it carefully, not wanting anyone to know how much money she had. Thus, it was her opinion that Ms. Durham would not have let Ms. Diffee have her purse. Such lay testimony was "rationally based on the perception of the witness," as A.R.E. 701 requires, and its admission was not in error.

Reversed and remanded.

GLAZE, CORBIN and BROWN, JJ., dissent.

TOM GLAZE, Justice, dissenting. The majority court does a good job setting out case law analysis in its discussion of A.R.E. Rule 404. In fact, it does a much better job than Ms. Diffee did at trial. The hearing on the admissibility of Mr. Diffee's testimony under A.R.E. Rules 404 and 801 was actually requested by the state. After hearing Mr. Diffee's pretrial testimony, the only objection Ms. Diffee interposed to admitting Mr. Diffee's testimony into evidence was that Mr. Diffee was unclear on whether Ms. Diffee attacked him with an ice pick. The following colloquy is all that I can find in the record concerning the admissibility of Mr. Diffee's testimony:

STATE: That's all I have on this motion, Your Honor.

THE COURT: Okay. I think clearly the attack is — there's no problem with that.

DEFENSE COUNSEL: Your Honor, we have — I think there's a big problem with the attack.

THE COURT: Oh, you do. What?

DEFENSE COUNSEL: Yes, Your Honor. This gentleman says someone stabbed him. He doesn't know what stabbed — he's cut, he's bleeding.

THE COURT: Oh, I think there's sufficient evidence there that, you know, —

DEFENSE COUNSEL: He comes back the next day and finds something on the floor under the bed.

THE COURT: He didn't find something. He found an ice pick.

DEFENSE COUNSEL: And says it's an ice pick. He just brings this to our attention a week or so ago.

THE COURT: Well, certainly, you can argue that. We're talking about whether or not it's admissible, not whether or not it's something you cannot or can attack at trial, you know. Certainly, I think it's admissible, sure.

Is this lady denying she attacked her mother?

DEFENSE COUNSEL: Denying she attacked who?

THE COURT: Well, that she committed the crime in this case?

DEFENSE COUNSEL: Yes, Your Honor.

THE COURT: Well, I think it's admissible then. Yeah.

As can be seen from the above, defense counsel's expressed concern went to the sufficiency of Mr. Diffee's testimony. The court's response was that counsel could "argue that," but the court said, "We're talking about whether or not it's admissible."

Defense counsel never stated any reason why Mr. Diffee's testimony was inadmissible. This court has repeatedly held that an objection must be specific enough to apprise the trial court of the specific error in question. *Scroggins* v. *State*, 312 Ark. 106, 848 S.W.2d 400 (1993). Again, Ms. Diffee's concern at the pre-trial hearing went to the sufficiency of Mr. Diffee's testimony, and it is also well settled that a party cannot change grounds for an argument on appeal. *Id.*

Finally, the majority opinion attempts to justify reaching the merits on the foregoing point by saying the state conceded that Ms. Diffee preserved an A.R.E. 404(b) objection. Obviously, the state is unable to concede a fact that did not, and does not, exist. To reiterate, Ms. Diffee made no Rule 404(b) objection; instead she argued only the insufficiency, not inadmissibility, of the evidence.

I pointed out above that the state's pretrial motion raised initial questions concerning the admissibility of Mr. Diffee's tes-

timony under A.R.E. Rules 404(b) *and* 801, but Ms. Diffee gave *no reason* to the trial judge why that testimony should be excluded under either one of those rules. For whatever reason, this court now ignores its longstanding rule requiring a party to apprise the trial court of the specific error it would make if it were to admit questioned evidence. This court's failure to follow this settled rule of review results in its reversing this case based upon an error and reason the defense never raised or mentioned to the trial judge.

For the foregoing reasons, I respectfully dissent.

CORBIN, J., joins this dissent.

ROBERT L. BROWN, Justice, dissenting. This is not a case where the State sought to bring in a prior bad act committed by Judy Diffee in an unrelated incident against a third party. It is a case where the appellant had attacked another family member under similar circumstances which included location, condition of the victim, and the weapon used — an ice pick. This encounter, as related by Eddie Diffee, may not shed light on Judy Diffee's specific intent to kill her mother as discussed in the seminal case on Rule 404(b), *Alford* v. *State*, 223 Ark. 330, 266 S.W.2d 804 (1954), but it most assuredly sheds light on her identity and her planning as the perpetrator. In short, this testimony was relevant to this case under Rule 404(b), and the trial court correctly admitted it.

The analogous facts in Edith Durham's murder and the Eddie Diffee attack are these. Regarding the murder of Edith Durham in 1992, (1) the victim was a close relative of Judy Diffee — her mother; (2) Judy Diffee lived on the same property as her mother in a detached portable building; (3) the victim was found on the couch in her nightgown; (4) the victim had been stabbed in her left arm, chest, back and head; and (5) the weapon used was, apparently, an ice pick. According to Eddie Diffee, in 1989 the facts of his attack were: (1) he was the husband of Judy Diffee; (2) they lived in the same home; (3) he was asleep in the front bedroom of his home at the time; (4) he was stabbed on his hand and head; and (5) an ice pick was found laying by the bed where the stabbing took place.

The majority debunks the similarities in the two incidents

and discusses, primarily, *modus operandi* for crimes against unknown third parties. But the opinion cites no authority in support of its conclusion that the attack on Eddie Diffee, a former family member, was not evidence of identity or plan. Ironically, the only case the majority does adduce on identity and plan is *Brenk* v. *State*, 311 Ark. 579, 847 S.W.2d 1 (1993), which involved family members and supports the State's position.

The majority attempts to distinguish *Brenk* v. *State, supra*, from the present case to no avail. In *Brenk*, the testimony in question was that of a former wife who said that Brenk once threatened to kill her and cut her body into pieces and scatter them. The crime for which Brenk was being tried was the murder of a subsequent wife and the placing of her torso in an ice chest which was found floating in a lake. This court held on appeal that the former wife's testimony was "similar" enough to the crime perpetrated to warrant admissibility as evidence of plan or identity under Ark. R. Evid. 404(b).

In considering *modus operandi*, we typically are considering conduct in an unrelated incident against a third party. *See, e.g., Dillon* v. *State*, 311 Ark. 529, 844 S.W.2d 944 (1993); *Frensley* v. *State*, 291 Ark. 268, 724 S.W.2d 165 (1987). The test used by this court, as the majority correctly points out, is uniqueness of the methodology employed and striking similarity. But where former family members of the perpetrator are involved, we have looked only to the similarity between the threats and attacks to determine admissibility. *See Brenk* v. *State, supra*. The reasoning for this is obvious. Where threats or attacks have been carried out against other family members, that fact renders the evidence more pertinent in a murder trial involving another family member. And more reliable.

The trial judge's ruling does not constitute a clear abuse of discretion which is the test for reversing a judge on an evidentiary decision. *Larimore* v. *State*, 317 Ark. 111, 877 S.W.2d 570 (1994); *Sweat* v. *State*, 307 Ark. 406, 820 S.W.2d 459 (1991); *White* v. *State*, 303 Ark. 30, 792 S.W.2d 867 (1990). But in addition, under the theory of this case, henceforth a malefactor may systematically murder members of his or her family in their home over a period of years using the same weapon and under the same general circumstances, and those prior crimes may not be used

to establish identity or plan. What could be more probative than such past conduct? I personally believe that the circumstances surrounding the Durham murder and the Eddie Diffee attack are strikingly similar. But they most definitely are sufficiently analogous for admissibility under the *Brenk* rationale, when family members are involved.

I respectfully dissent.

CORBIN, J., joins.