Anthony Frederick THRASH *v.* STATE of Arkansas

CR 86-161                                         726 S.W.2d 283

Supreme Court of Arkansas
Opinion delivered March 30, 1987

*Don E. Glover*, for appellant.

*Steve Clark*, Att'y Gen., by: *Theodore Holder*, Asst. Att'y Gen., for appellee.

DAVID NEWBERN, Justice. The appellant, Anthony Frederick Thrash, was convicted of capital felony murder and sentenced to life imprisonment without parole. Three points for reversal are raised. First, the appellant contends there was no evidence showing he committed the aggravated robbery which was the underlying felony charged with the murder. We find the evidence given by his alleged accomplice, Diedra Gaddy, sufficiently corroborated to support the conviction. Second, the appellant

contends evidence of a burglary and aggravated robbery alleg-edly committed by him subsequent to the alleged murder was improperly admitted in violation of A.R.E. 404(b). We hold the evidence of those crimes was admissible, respectively, to show a plan and a *modus operandi*. Third, the appellant contends venue was improperly laid in Desha County. We hold the venue was correctly laid because the crime could have been found to have been planned and partially executed in Desha County. In addi-tion to considering these arguments, we have reviewed the record and the objections raised at trial pursuant to our Rule 11(f), and we find no reversible error.

## 1. Sufficiency of the evidence

### a. Diedra Gaddy's testimony

Diedra Gaddy testified to the following: She and Thrash began living together on January 15, 1980, at 133 Oak Street in Dumas. She was seventeen. They gambled for a living and grew dissatisfied with their existence in Dumas. Thrash decided they should go to Chicago, where he said he had previously lived, and where he could make money at the horse races. Thrash conceived a plan to take someone's car, kill the owner, and thus not "leave a witness." He told Gaddy to obtain wigs from her mother's house. She obtained the wigs. Thrash obtained a shotgun, and Gaddy watched him saw off the barrel so that the gun was twenty to twenty-four inches long.

On June 6, 1980, Thrash dressed as a woman. Gaddy put on clothes different from her usual attire, and she wore extra makeup which she described as "overdone." They carried purses, and the one carried by Thrash was large. Thrash carried the shotgun in his purse with ammunition they obtained earlier that day in Pine Bluff. They walked from their house to a shopping center where a parking lot carnival was in progress. It was between 9:00 and 10:00 p.m., and they stood for fifteen or twenty minutes near a Piggly Wiggly store and in front of Magic Mart.

Tommy Bruce Gill approached Gaddy and Thrash in a black truck and asked if they needed help. They replied they needed a ride to Pine Bluff and would make it worth his time. Gill invited them into the truck. Gaddy sat in the middle, and Thrash sat by the window on the passenger side of the seat. Gaddy did the

talking because they thought Thrash's voice might have revealed he was a male.

As the three drove toward Pine Bluff, Thrash nudged Gaddy indicating "he had to go to the bathroom." Gaddy told Gill to pull over, and he did so. Gaddy and Thrash got out of the truck and went around in front of the truck. Thrash squatted down as if to urinate as a woman. That placed him out of the sight of Gill who remained in the truck with the lights off but the motor on. He told Gaddy to stay in front of the truck while he went around to the passenger side window. Thrash pulled the gun from the purse and shot Gill. Gill's foot "hit the gas." Thrash ran around to the driver's side and shot him again. They loaded the body in the bed of the truck, drove back to Hatley Hill lover's lane, which is apparently near Dumas. Thrash dragged the body up to a dilapidated farm house under which the body was left. They then drove back to "the projects" near their residence, parked the truck on Oak Street, and walked to their house.

Gaddy and Thrash removed the clothing they had worn and burned it in their bathtub. At that point, around 3:00 or 4:00 a.m. the next morning, Thrash said they needed to get more money. (After a conference held in the judge's chambers, the judge admonished the jury that evidence of other crimes might be taken and that it would not be admitted to prove the character of the accused or that he acted in conformity therewith.) Gaddy and Thrash then went to Blount's Pool Hall about three or four blocks from their residence. Thrash went in, after climbing to the roof, and came out later with a lot of change. They returned home to pack their belongings.

Gaddy and Thrash then began driving the truck toward Kansas. While buying gas in Little Rock Thrash noticed blood on the truck so they stopped long enough to wash it. Upon arriving in Kansas City, Kansas, they spent a couple of days with a friend and then drove the truck to the home of Gloria Tillman, Thrash's ex-wife, to visit Thrash's son. Thereafter they drove the truck to another friend's home. Later the truck ceased running. A friend drove Thrash and Gaddy to the site of the truck's demise where Thrash removed the license tag and inspection sticker.

The pair had no money. They were living in the backyard of a friend and on top of a building in a park. Food became scarce.

(The court at this point again admonished the jury with respect to proof of other crimes.) They then planned to rob a liquor store using the same wigs they had used as disguises in Dumas. They put on make-up and the wigs, although this time they did not wear dresses, and walked into the liquor store. Gaddy had a hand-gun, and Thrash had the shot gun in a purse. They made the owner of the store lie down, but she had to get up to help Thrash who could not open the cash register. Gaddy and Thrash left the liquor store, removed their disguises, and shortly thereafter were apprehended by Kansas authorities.

### b. Corroborating testimony

Diedra Gaddy's testimony clearly covered facts sufficient to show a murder committed in the course of an aggravated robbery. Her testimony is not enough, however, to sustain the conviction of Thrash because she was an accomplice. To be sufficient to sustain the jury's verdict, we must find that her testimony was corroborated by other evidence tending to connect Thrash with the commission of the offense. Ark. Stat. Ann. § 43-2116 (Repl. 1977).

Keith Butcher and Danny Wells testified that they were riding together in a car on an evening around the time their friend Gill disappeared. Their attention was attracted to two unusually-dressed persons. One of them was obviously a male dressed as a female. They were seen in the shopping center parking lot. From photographs shown them by police both Butcher and Wells positively identified Thrash as the person they saw dressed as a female.

Bobbie Sue Robertson remembered seeing two females get into Gill's truck at the parking lot. One of them appeared to her to be a male because of hair on his legs and a muscular face and hands.

Michael Thrash, the appellant's brother, testified that he rented the house at 133 South Oak Street after the appellant left, and he found burn marks in the bathtub.

Gloria Tillman testified that the appellant, Thrash, and Diedra Gaddy came to her house in Kansas City, Kansas, in June or July of 1980. When they arrived, she glanced outside and saw a black truck in front of her house.

Marie Huska testified that she operated Huska's Liquor Store in Kansas City in 1980. On June 19, 1980, two persons came in the store. One was a very young girl who immediately pulled a hand gun and told Huska to hit the floor. The other one tried unsuccessfully to open the cash register. Huska got up to help, and as she did so, she heard the second person's voice, and realized it was a man dressed as a woman. He was holding a "blue steel rod" down by his side.

Dennis Roberts of the Kansas City Police Department testified he was called to the scene of the Huska Liquor Store robbery. Based on a description of the robbers as two Negro women, he arrested two persons walking quickly on the street. One of them was Thrash.

This evidence corroborates the testimony of Gaddy. It also tends to connect Thrash with the aggravated robbery and murder of Gill. While the evidence, independent of Gaddy's testimony, would not be sufficient to convict Thrash of capital felony murder, it need not be that strong. *Bly* v. *State*, 267 Ark. 613, 593 S.W.2d 450 (1980). It is sufficient if it, to some degree, connects Thrash with the crime. *Price* v. *State*, 267 Ark. 1172, 599 S.W.2d 394 (1980).

Thrash argues that there is no substantial evidence of the robbery. We hold the evidence that Thrash was seen dressed in a female disguise getting into Gill's truck shortly before Gill was murdered, combined with testimony connecting him thereafter with a similar truck, and combined with evidence of a subsequent robbery committed by him using the same kind of disguise is sufficient. It tends, independently of Gaddy's testimony, to show Thrash took Gill's truck, and it clearly corroborates Gaddy's testimony that he did so. The pool hall burglary was also established by the testimony of its owner. All of these items together tend to demonstrate the plan Thrash developed to go to Chicago after getting transportation, killing any witness, and obtaining money for the trip. We are not required to isolate these incidents if they are part of a plan. *Sumlin* v. *State*, 273 Ark. 185, 617 S.W.2d 372 (1981); *Ruiz* v. *State*, 265 Ark. 875, 582 S.W.2d 915 (1979). Corroboration of Gaddy's testimony showing there was a plan, of which Thrash was the instigator, to get a vehicle and leave no witness is enough

corroboration of the aggravated robbery.

## 2. Other offenses

Thrash objected to the testimony concerning the pool hall burglary and the liquor store robbery. Arkansas Rules of Evidence 404(b) provides:

> (b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The evidence of the documented pool hall burglary, the state argues, established a "time frame" and helped clear up conflicts in testimony as to dates. It did more than that, however. It was evidence of a link in the plan to get a vehicle and go from Dumas to Chicago. It showed how Thrash and Gaddy obtained the money to begin their travels. It was independently relevant and thus admissible evidence. *Price* v. *State*, 268 Ark. 535, 597 S.W.2d 598 (1980); *Alford* v. *State*, 223 Ark. 330, 266 S.W.2d 804 (1954). In addition, the evidence of the pool hall burglary in the form of testimony of the owner, Mr. Blount, was corroborative of Gaddy's testimony about the manner in which she and Thrash obtained their traveling money.

Likewise, the liquor store robbery evidence showed a *modus operandi* which corroborated Gaddy's testimony about the robbery and murder of Gill. While Rule 404(b) does not mention *modus operandi* as one of the legitimate bases for introducing evidence of other crimes, we note that the rule contemplates that the list of exceptions is not exclusive, for it discusses admission of such evidence for "other purposes, such as" the ones listed. *White* v. *State*, 290 Ark. 130, 714 S.W.2d 784 (1986). *See Price* v. *State*, 267 Ark. 1172, 599 S.W.2d 394 (Ark. App. 1980). We have held that evidence of a crime other than the one charged may be admitted to show the appellant committed the crime charged where both involved the same unique method of operation. *Frensley* v. *State*, 291 Ark. 268, 724 S.W.2d 165 (1987).

Even when the evidence of other crimes has independent probative value, as here, the trial judge may exclude it if its potential prejudice exceeds its probative value, A.R.E. 403(a). Here the trial court exercised his discretion to let the evidence in with proper admonitions to the jury. We find no abuse of discretion.

### 3. Venue

The evidence showed Thrash hatched the plan to rob someone of a vehicle in Desha County. He obtained the implements of disguise there. He sawed off the shotgun there, and began his ride with Gill there. The murder and robbery occurred in Lincoln County, but the body was returned to Desha County. The controlling statute is Ark. Stat. Ann. § 43-1414 (Repl. 1977) which provides:

> Two counties, offenses committed in. — Where the offense is committed partly in one [1] county and partly in another, or the acts or effects thereof, requisite to the consummation of the offense, occur in two [2] or more counties, the jurisdiction is in either county.

We have no doubt that acts "requisite to the consummation of the offense" occurred in Desha County, thus venue was properly laid there. *See Hill* v. *State*, 253 Ark. 512, 487 S.W.2d 624 (1972).

Affirmed.