Kenneth WILLIAMS *v.* STATE of Arkansas

CR 00-520 36 S.W.3d 324

Supreme Court of Arkansas
Opinion delivered February 1, 2001

*John W. Cone*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Jeffrey A. Weber*, Ass't Att'y Gen., for appellee.

J IM HANNAH, Justice. Appellant Kenneth Williams was convicted of capital murder, attempted capital murder, two counts of aggravated robbery, two counts of kidnapping, two counts of theft of property, and one count of arson, and sentenced by a jury to life in prison without parole. Williams raises two points on appeal. First, Williams argues that the trial court abused its discretion by allowing the State to introduce evidence of another crime for which he was convicted to prove modus operandi under Ark. R. Evid. 404(b). Second, Williams argues that the trial court

erred by not granting a mistrial due to prosecutorial misconduct during closing arguments. We find no merit to Williams's argument and affirm.

*Facts*

On December 13, 1998, Peter Robertson, a student at the University of Arkansas at Pine Bluff, and his friend Dominique Herd borrowed a friend's gold 1999 Mitsubishi Galant and went to dinner at Bonanza Steak House in the late afternoon. Upon exiting the restaurant after dinner while it was still daylight, a man approached the couple, briefly conversed with them, and then pulled a gun, a silver revolver, and forced them into their car. The man sat in the back seat of the car and directed Robertson where to drive. He first made them go to a bank ATM to withdraw approximately $70 from Robertson's account, and they then attempted to withdraw money from Herd's account. When Herd could not remember the password, the man directed Robertson to drive off.

During the drive, the man continued to tell the couple that they would be fine. He made the couple drive around town, and he directed them down several dead-end streets. At one dead-end, he made the couple get out of the car, and he made Robertson take a picture of Herd with Robertson's camera, after the man lifted Herd's dress and pulled down her underwear. Robertson took a second picture of the man after Herd had straightened her clothes. After this episode, the man directed the couple to drive to another dead-end street, exit the car, climb a fence, go behind a shed, and kneel down. The man then got into the car and pulled off; however, he backed up, asked Herd for her pocketbook, and then asked, "Where did you say you were from again?" Herd answered, "Dallas," and Robertson answered, "New Jersey." The man then said, "I don't like the niggers from Dallas anyway," and started shooting the couple, emptying the gun. The man then drove off. Robertson was able to make it to the road where a passing car picked him up and took him to a house where he called the police. Robertson survived the shooting, but Herd died from a gunshot to her head. The police ultimately found the car at the end of a dead-end street where it had been burned.

On December 18, 1998, Williams was charged with one count of capital murder, one count of attempted capital murder, two

counts of kidnaping, two counts of aggravated robbery, two counts of theft of property, and one count of arson. Williams was appointed a public defender, and Williams's counsel and the prosecutor proceeded with motions and discovery. Included in those motions was a motion in limine filed on September 9, 1999, by defense counsel requesting that the trial court prohibit introduction of Williams' prior aggravated robbery conviction under Rule 404(b) of the Arkansas Rules of Evidence because that evidence was not relevant, and its probative value was vastly outweighed by its prejudicial impact. On that same day, the State moved to introduce this same evidence under the *modus operandi* exception to the general rule of exclusion. In an Order filed September 13, 1999, the trial court granted the State's motion to introduce that evidence, and in effect, denied Williams's motion to exclude the same evidence.

Jury selection began on September 9, 1999, and the trial concluded on September 14, 1999. The prosecution presented fifteen witnesses. The prosecution's first witness was Robertson, who testified about the facts surrounding his and Herd's abduction. During his testimony, Robertson identified the perpetrator as Williams, and pointed to him in the courtroom. Robertson also testified that when questioned by the police, he originally described the perpetrator as possibly having a gold tooth. However, Robertson testified that upon later reflection, he did not think that the man had a gold tooth. Robertson also testified that he identified Williams in a photo lineup as the man who shot him and Herd.

Next, Shantella Anderson testified that the burned car that was recovered was hers, and that it was a total loss. Stephen Hankins testified that he and his brothers went back to the scene of the shooting after one of his brothers drove up to the house with Robertson in the car after he had been shot. Hankins and his brothers found Herd where Robertson described, and Hankins testified that they attempted CPR on her and ultimately flagged down a car to call an ambulance. The prosecution presented other witnesses who testified about seeing a man possibly matching Williams's description who was driving a car like Anderson's, and who entered a convenience store on the night of the shooting. These witnesses, however, could not identify who the man was. Richard Gilliam testified that he worked with Williams around the time of the shooting, and that Williams took unprecedented interest in the newspaper story about the car-jacking and shooting.

The prosecution then presented testimony from the medical providers and State Crime Lab investigators who worked on this case. Dr. Lee Forestiere testified about Robertson's injuries when Robertson was taken to the emergency room. Dr. Charles Kokes, an associate medical examiner at the State Crime Lab, testified about the autopsy performed on Herd. He stated that Herd sustained two gunshot wounds, including one to the top of her head, fired at a range of more than two feet away, and that these wounds were the cause of death.

The State presented evidence from the investigating officers in Pine Bluff. Greg Bolin, an investigator at the Jefferson County Sheriff's Department, testified that he went to the scene of the shooting after receiving a call at about 5:20 p.m. on December 13, 1998. He testified that Anderson's car was found burning about two blocks from Williams's apartment. Bolin also testified that Robertson described the perpetrator to him as he helped prepare an identification kit, and that Robertson was not sure whether the man had a gold tooth. Ultimately, Bolin testified that Williams became a suspect in another similar car-jacking case in which a car was burned in almost the same location. Furthermore, Bolin testified that Robertson selected Williams in the photo lineup. Stephen Moreau, an investigator with the Sheriff's department, also testified and added that Williams lived about two blocks from where the cars were burned, and that the cars were burned about fifty to seventy-five yards away from each other. Moreau testified that Robertson reacted strongly when shown a picture of Williams, and that Robertson identified Williams from a picture. Moreau also stated that Robertson said the perpetrator wore black Lugz boots, but that upon searching Williams's apartment, the police did not find any such boots. However, Moreau stated that in the search of Williams' apartment, the police found the insurance card of Sharon Hence, the victim of the other car-jacking incident for which Williams was convicted.

On the next day of trial, Hence testified. She testified that she was at an ATM machine in Pine Bluff, and Williams got into her car, made her withdraw money, and forced her to drive away. He held her at gunpoint with a silver revolver, and made her drive around town, often driving down dead-end streets. He apparently yelled at her not to have a wreck, and that he could not let her out because she would call the police. He then made her pull down a dead-end street, give him all of her jewelry, and then get out of the

car. He wanted her to walk toward some nearby woods, but when she refused, he drove away. The car was later found burned near SEARK college, close to where Williams lives. Hence testified that she picked him out of a lineup, and she also identified him in court.

After presenting another witness, the State rested, and the defense renewed its motion for a directed verdict, which was denied. The defense then presented its case. Several witnesses were offered to provide a time-line for December 13, 1998, to show that Williams could not have committed these crimes. For example, Willie Buckley and Kevin Isom testified that Williams was at Buckley's house at about 2 p.m. to watch a football game on television, and that Williams left at about 3:30 or 4 p.m. The defense also established that Williams usually left his apartment door unlocked because he had lost his key, and that anyone could enter the apartment. Williams's sister, Yolanda Williams, testified that the composite sketch the police created with Robertson's help actually looked more like Larry Carter, Williams's and Yolanda's cousin. Finally, the defense presented testimony from David Parsley and Billy Anderson. Parsley, an assistant fire chief, testified that in 1998, there were 110 automobile fires, with nine listed as arson, thirteen as suspicious, and six as undetermined. He testified that when a car is burned, it is usually done on a dead-end street or in a secluded area. Anderson, a salesman at Smart Mitsubishi in Pine Bluff, testified that his dealership sold 335 Galants from 1994 until trial, and twenty were gold in color.

The defense rested and renewed its motion for directed verdict, which again was denied. Counsel then proceeded to closing arguments. During the prosecution's closing, the prosecutor stated, "You can have a gold tooth today and not have one tomorrow. So maybe he did; maybe he did not. Anyone knows that. Matter of fact, I didn't have one this morning. Guess what? I'll show you something...," and as the prosecutor attempted to pull something from his pocket, the defense objected. A bench conference ensued, and the defense moved for a mistrial due to prosecutorial misconduct. The court denied the motion, but admonished the jury. After closing arguments, the defense developed the matter further, renewing its motion for mistrial, and developing that the prosecutor had attempted to pull a false gold tooth from his pocket to show the jury. Again, the trial court decided that the admonition and the regular jury instructions were sufficient to warn the jury not to

consider any such information that was not submitted into evidence during the trial.

After deliberations, the jury returned with a guilty verdict on all counts. During sentencing, the defense objected to an aggravator offered by the prosecution, but the court allowed it. The jury then returned a sentence of life in prison without parole. The Judgment and Commitment Order were filed on October 4, 1999, and Williams filed his Notice of Appeal and Designation of Record on October 6, 1999.

## Standard of Review

The admission or rejection of evidence under Rule 404(b) is committed to the sound discretion of the trial court, and this court will not reverse absent a showing of manifest abuse. *Gaines v. State*, 340 Ark. 99, 8 S.W.3d 547 (2000); *Echols v. State*, 326 Ark. 917, 936 S.W.2d 509 (1996). A mistrial is an extreme remedy that should only be granted when justice cannot be served by continuing the trial. *Woods v. State*, 342 Ark. 89, 27 S.W.3d 367 (2000). We will not reverse a trial court's decision to deny a motion for mistrial absent an abuse of discretion or manifest prejudice to the complaining party. *Kail v. State*, 341 Ark. 89, 14 S.W.3d 878 (2000); *see also, Lee v. State*, 340 Ark. 504, 11 S.W.3d 553 (2000). A trial judge is given broad discretion to control counsel in closing arguments, and this court does not interfere with that discretion absent a manifest abuse of it. *Gates, v. State*, 338 Ark. 530, 2 S.W.3d 40 (1999); *Mills v. State*, 322 Ark. 647, 910 S.W.2d 682 (1995).

## I. Modus Operandi or Rule 404(b) Evidence

During trial, the court allowed the State to introduce testimony from Sharon Hence, a woman who was abducted and robbed in a previous incident by Williams, who was convicted of that crime. The State offered the evidence to prove that Williams used the same *modus operandi* in this case as he had in the incident with Hence. The State offered evidence that Hence, too, was held at gunpoint with a silver revolver, made to withdraw money from an ATM, drive around town down dead-end streets, and finally dropped off in a secluded place in town. Furthermore, the State showed that Hence's car also was burned in a secluded place not far from Williams's home after Williams abandoned it.

■ Williams couches his argument in terms of admissibility under Ark. R. Evid. 404(b) and the *modus operandi* exception. In *Haire v. State*, 340 Ark. 11, 8 S.W.3d 468 (2000), this court determined that the analysis for admissibility of such evidence for *modus operandi* is different from the Rule 404(b) analysis. *See also, Diffee v. State*, 319 Ark. 669, 894 S.W.2d 564 (1995). The court in *Haire* stated:

> [T]he test for proving *modus operandi*. That test is different from the proof required for a Rule 404(b) exception such as intent. *See Diffee v. State*, 319 Ark. 669, 894 S.W.2d 564 (1995) (both *modus operandi* and proof of intent as an exception under Rule 404(b) were examined and discussed). Simply stated, proof of *modus operandi* is not the same as proof of a Rule 404(b) exception to other bad acts. The two evidentiary concepts are different.

*Haire*, 340 Ark. at 16. However, the court in other cases has found that *modus operandi* is an unnamed exception to the Rule 404(b) exclusion of certain evidence. *See, e.g., Burmingham v. State*, 342 Ark. 95, 27 S.W.3d 351 (2000); *Thrash v. State*, 291 Ark. 575, 726 S.W.2d 283 (1987). Because the distinction has been blurred in many of this court's cases due to the similarity of concepts between *modus operandi* and Rule 404(b)'s "motive, intent, or plan" and because the State argues that the evidence is admissible under either analysis, they will both be discussed.

### A. Modus Operandi

■ There are two requirements for introducing evidence of an unrelated prior act to show *modus operandi*, or a method of operation: "(1) both acts must be committed with the same or strikingly similar methodology; and (2) the methodology must be so unique that both acts can be attributed to one individual." *Frensley v. State*, 291 Ark. 268, 274, 724 S.W.2d 165, 169 (1987) (citing Edward J. Imwinkelried, *Uncharged Misconduct Evidence*, § 3.10 to 3.12 (1984)). The first requirement is that there be a very high degree of similarity between the charged crime and the prior uncharged act. *Diffee, supra*. The second requirement for admission as a method of operation is that the methodology be so unique that it independently identifies the accused as the perpetrator. *Id.*

This court has allowed *modus operandi* evidence in some cases. In *Burmingham*, one of the "blue-light rapist" cases, the court found

that "comparing this witness's testimony to the events described by S.W., it appears that appellant performed his rapes following the same *modus operandi* on both victims." *Burmingham*, 342 Ark. at 108. The court then listed the similarities of the two incidents.

In *Jacobs v. State*, 287 Ark. 367, 699 S.W.2d 400 (1985), this court allowed evidence of prior bad acts in an automobile breaking-and-entering case because the "similarity of method used to enter the vehicle is remarkable and the vehicles were all on the parking lot at McCain Mall." *Id*, 287 Ark. at 369. In *Frensley, supra*, the court, after listing the similarities, allowed evidence of a prior crime in an aggravated robbery and kidnaping case stating:

> Both actions were committed in the same unique fashion. Further, the two acts were so unique and uncommon that they became distinctive and identifying. The two acts establish a method of operation. The inference is clear, there were not two different robbers.

*Frensley*, 291 Ark. at 274.

This court, however, at times has found that the level of evidence was insufficient to meet the requirements under the *modus operandi* exception. In *Diffee, supra,* the court determined that the defendant's attempted attack with an ice pick on her husband was not sufficient to meet the requirements under *modus operandi* to allow the act to be admitted in the defendant's murder trial for the death of her mother, whom she murdered with an ice pick.

The *Diffee* court quoted a legal treatise detailing examples of sufficient acts which met the *modus operandi* test. The court quoted Edward J. Imwinkelried, *Uncharged Misconduct Evidence* (1984), wherein Professor Imwinkelried stated:

> There are numerous, excellent hypothetical and actual examples of unique methodology.
>
> The hypothetical examples are more colorful. Professor Alan Polasky of the University of Michigan hypothesized the bandit with the silver crossbow. The British examples are just as histrionic; criminals who repeat a particular humorous limerick or who wear the ceremonial headdress of an Indian chief. More recently, Professors Broun and Meisenholder have given us the example of the robber wearing the medieval knight's helmet. The point of each hypothetical is to illustrate the required standard of uniqueness.

There are several illustrations drawn from actual cases that are equally good examples of the standard. The courts have admitted evidence of other crimes to establish a one-of-a-kind modus operandi in the following cases: The burglar always left a bathroom scale on the front door of the burgled residence; the drug trafficker sold a type of white heroin rare in the San Antonio area; the killer always shot the victim in the back near the fourth cervical vertebra; the thief used a rare automobile to make his getaway; the forged money orders were identical in amount, payee, and payer and sequential in number; the burglaries were committed after the burglar bypassed the alarm system in a sophisticated, distinctive manner; the bank robber wore rose-tinted wire-framed glasses and a certain color shirt and wig; the caller making the phone threat always mentioned a "Mary D" during the call; and the smugglers used the same ingenious stratagem even though on one occasion the smuggled contraband was drugs but on the other occasion the contraband was a handgun. In these cases, although the crimes may not have been identical in every detail, the crimes were sufficiently similar and the modus sufficiently unique to justify admitting the uncharged misconduct evidence to show identity.

*Diffee*, 319 Ark. at 677-678 (quoting Imwinkelreid, *supra* at § 3.13).

Here, the similarities in both crimes are striking. To begin with, the crimes took place close in time, December 5 and December 13, 1998. In both crimes, Williams encountered strangers and forced himself into their cars with them. He then made the victims give him personal belongings, and forced them to withdraw money from ATMs. He forced the victims to drive around town, at times taking them down dead-end streets, until in both instances he dropped off the victims at dead-end streets and made them leave the cars with him. After driving the cars himself, Williams parked them in nearly the same area and burned them. Both Hence and Robertson described Williams's gun as a silver revolver.

There are differences in the two incidents, however. In Hence's case, Williams entered her car while she was at the ATM instead of approaching her while she was out of her car, and Williams wore different clothing in the incident with Hence than the offender wore in the second incident. According to the testimony, Williams was threatening during the incident with Hence, but the offender in the second incident was reassuring to Robertson and Herd. In addition, the offender made Herd pose for a sexually humiliating photograph, but Williams did not violate Hence in any way. Finally, the end result is different because Williams did not

harm Hence in the first incident, but the offender shot Robertson and killed Herd in the second incident.

 Both crimes were committed with strikingly similar methodology. Thus, the first requirement for introducing evidence of an unrelated prior act to show *modus operandi* is satisfied. The issue is whether the second requirement, that the methodology must be so unique that both acts can be attributed to one individual, has been satisfied. In this case, the most unique and compelling similar methodology that goes to independently identifying Williams as the perpetrator of both crimes is that both cars were burned within fifty to seventy-five yards of each other and approximately two blocks from Williams home, a silver revolver was used in both incidents, and the perpetrator forced the victims to drive around Pine Bluff and down several dead-end streets. However, the evidentiary similarities are not so unique that they independently identify Williams as the perpetrator of both crimes. The trial judge erred in allowing the prior crime to be introduced into evidence to show *modus operandi*.

## B. Rule 404(b)

 Arkansas Rule of Evidence 404 (b) states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Evidence offered under Rule 404(b) must be independently relevant, thus having a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. *McGehee v. State*, 338 Ark. 152, 992 S.W.2d 110 (1999). This court has recognized that the list of exceptions to inadmissibility under Rule 404(b) is not an exclusive list but rather represents examples of the types of circumstances where evidence of other crimes or wrongs or acts would be relevant and admissible. *Burmingham; Lindsey v. State*, 319 Ark. 132, 890 S.W.2d 584 (1994).

This court addressed the admissibility of evidence under the exceptions to Rule 404(b) in *Sasser v. State*, 321 Ark. 438, 902

S.W.2d 773 (1995). In that case, the defendant, Andrew Sasser, was convicted of capital felony murder and sentenced to death for the kidnapping, attempted rape, and murder of Jo Ann Kennedy, a convenience-store clerk. During trial, the prosecution presented evidence of a prior similar crime committed by Sasser involving the battery, kidnapping, and rape of another store clerk several years earlier. On appeal, this court addressed the admissibility of the prior crime under Rule 404(b). In ruling that the evidence was admissible, the court compared the similarities and differences in the crimes and stated:

> We conclude the 1988 crimes bore sufficient similarity to the present crime to justify proof of the former as probative of appellant's intent to commit the predicate offenses of the latter. *Brenk v. State*, 311 Ark. 579, 847 S.W.2d 1 (1993); *Snell*, 290 Ark. 503, 721 S.W.2d 628. The record in this case shows that on December 31, 1992, less than six months before the commission of the present crime, appellant was discharged from the Arkansas Department of Correction having completed his sentence for his 1988 crimes. Both the 1988 crimes and the present crime involved female victims on duty as employees of E-Z Mart stores located in neighboring communities. Both were committed shortly after midnight by appellant, without accomplices, after he had purchased items from the victim at the store and had made several trips to the store on the day of the attack. Both involved a physical struggle between appellant and the victim that started in one part of the store and moved to other parts. Both involved sexual implications. In 1988, Carter pleaded for her life, whereas the victim in the present case was killed. In 1988, appellant apparently traveled to the E-Z Mart on a bicycle, whereas he borrowed his brother's pickup truck in the present case. Clearly, the challenged testimony had probative value which, we conclude, was not substantially outweighed by the danger of unfair prejudice. *See* Rule 403.

*Sasser*, 321 Ark. at 446-447. The majority noted that the dissent challenged the admissibility of the evidence because the prior crime was not sufficiently similar to the present crime to allow its admission under Rule 404(b). However, the majority stated:

> The degree of similarity between the circumstances of prior crimes and the present crime required for admission of evidence under Rule 404(b) is a determination that affords considerable leeway to the trial judge, and may vary with the purpose for which the evidence is admitted. *See* 1 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 112, n. 4 and accompanying text (2d ed. 1994) ("To be probative, prior criminal acts must require an

intent similar to that required by the charged crime, although it is usually said that the prior crime need not closely resemble the charged crime."); 1 John W. Strong, *McCormick on Evidence* § 190, n. 31 and accompanying text (4th ed. 1992) ("The similarities between the act charged and the extrinsic acts [admitted to show the act charged was not performed inadvertently, accidentally, involuntarily, or without guilty knowledge] need not be as extensive and striking as is required . . . [to show *modus operandi*]"). *See generally* 2 Jack B. Weinstein, et al., *Weinstein's Evidence* ¶ 404[12] (1995); 2 John Henry Wigmore, *Evidence in Trials at Common Law* § 302 (Chadbourn rev. 1979). On this record, we conclude the similarity between the circumstances of the 1988 crimes and the predicate offenses of the present crime was sufficient to support the trial court's admission of the challenged testimony under Rule 404(b) as independently relevant proof of appellant's intent to commit the predicate offenses.

*Sasser*, 321 Ark. at 447.

■ ■ The Hence crime is independently relevant proof of Williams's intent to commit these offenses. Williams's prior crime against Hence is admissible under the intent exception to Rule 404(b). The Hence crime was not admissible into evidence to show *modus operandi*. However, we will affirm the ruling of a trial court if it reached the right result, even though it may be for a different reason. *Summers Chevrolet, Inc. v. Yell County*, 310 Ark. 1, 832 S.W.2d 486 (1992). *See Register v. State*, 313 Ark. 426, 855 S.W.2d 320 (1993). Here we affirm the ruling of the trial court because it reached the right result even though we are affirming the result for a different reason than the trial court used.

## II. Prosecutorial Misconduct

In his second and last point on appeal, Williams argues that the trial court erred in failing to grant a mistrial due to prosecutorial misconduct during closing arguments. Williams claims that the prosecutor's act of attempting to pull out and exhibit a false gold tooth to the jury was sufficient to warrant a mistrial because the gold tooth had not been admitted into evidence prior to closing arguments. The State responds that the trial court did not abuse its discretion in denying Williams's motion for mistrial because the trial court sufficiently admonished the jury and Williams never objected that the admonishment was inadequate.

A mistrial is an extreme remedy that should only be granted when justice cannot be served by continuing the trial. *Woods, supra.* This court has recognized on multiple occasions that not every instance of prosecutorial misconduct mandates a mistrial and that any prejudice suffered may be cured by a proper admonition. *See, e.g., Muldrew v. State,* 331 Ark. 519, 963 S.W.2d 580 (1998); *White v. State,* 330 Ark. 813, 958 S.W.2d 519 (1997); *Sullinger v. State,* 310 Ark. 690, 840 S.W.2d 797 (1992); *Porter v. State,* 308 Ark. 137, 823 S.W.2d 846 (1992). Remarks that require a reversal are rare and require an appeal to the jurors' passions. *Lee v. State,* 326 Ark. 529, 932 S.W.2d 756 (1996). In the event an improper statement has been made, an admonition to the jury usually cures any prejudice unless the argument is so patently inflammatory that justice could not be served by continuing the trial. *Puckett v. State,* 324 Ark. 81, 918 S.W.2d 707 (1996); *King v. State,* 317 Ark. 293, 877 S.W.2d 583 (1994).

In this case, the following transpired:

> MR. BLOODMAN: ... But the only straw that they managed to hold on to throughout this whole case has been one thing. This gold tooth nonsense. Anyone — anyone who lives in a black neighborhood knows what? You can have a gold tooth today and not have one tomorrow. So maybe he did; maybe he did not. Anyone knows that. Matter of fact, I didn't have one this morning. Guess what? I'll show you something —
>
> MR. KIZER: May we approach, please?
>
> THE COURT: You may.
>
> (*Counsel approached the bench.*)
>
> MR. KIZER: That hasn't been introduced into evidence.
>
> MR. BLOODMAN: I'm not introducing it.
>
> MR. KIZER: Your Honor —
>
> THE COURT: You can't argue anything that's not been introduced into evidence.
>
> MR. CONE: If we can approach the bench, your Honor? We are requesting a mistrial. He's pulled something out in front of this jury.
>
> MR. BLOODMAN: I've not showed them anything.

THE COURT: They will be instructed to disregard anything that's said or done by counsel that's not in the evidence, and I'll —

MR. CONE: Are we making a record that we've requested a mistrial at this point?

THE COURT: Yes.

MR. CONE: Thank you.

(Conclusion of bench conference.)

THE COURT: The Court is going to instruct the jury again to disregard any argument, statement or remarks of the attorneys that have no basis in the evidence.

Following this discussion, the prosecutor finished his closing argument. The trial court then invited defense counsel to begin, and defense counsel renewed the defense motion for a mistrial, and asked the trial court to allow the defense to get on the record exactly what had transpired. The trial court allowed the defense to make the record after the jury had retired. During this exchange, the defense described what took place during the prosecutor's closing arguments, and then stated:

MR. CONE: Mr. Garfield, as I understood it, and, again, I might need to have the record played back for me as to what he was saying, told the jury, roughly, "You can have a gold tooth today and not have one tomorrow," and I saw him reach in and pull something out. I could not see what it was. I could not tell if the jury saw what it was. That is why we jumped up and objected, because it was giving the impression he was about to show the jury something. I'd like to know at this time what it was that he had.

THE COURT: What were you pulling out of your pocket, Mr. Bloodman?

MR. BLOODMAN: Well, first of all, your Honor, for the record —

THE COURT: Yes.

MR. BLOODMAN: First of all, for the record, your Honor, I attempted to go in my pocket. Had not been able to do so. Nothing was retrieved from my pocket. To the extent that something was going to be shown, nothing had been shown. And if he have any evidence as such, he can bring it forward, but I never got to that point. Secondly, what I said was, I said, "I did not have a gold tooth this morning. I could have one this afternoon," and at

that point I was attempting to show that I could do that and that's when I reached in my pocket to retrieve this, which I never had a chance to do that.

MR. CONE: I would ask that that be introduced at this time.

THE COURT: What is it?

MR. BLOODMAN: It's a tooth.

MR. CONE: Would you show the Judge what it is you were going to show the jury.

MR. BLOODMAN: As you can see where it was folded, I never even got close to get into my pocket much less show it to anyone in the courtroom until now.

THE COURT: Well, it appears to the Court that it is some kind of gold cap with a star in it that could or could not fit over a tooth.

Thereafter, the trial court determined that the admonition he gave to the jury along with the jury instructions at the end of the case sufficiently instructed the jury to disregard any information not in evidence in trial.

█ █ A mistrial was not warranted in this case. The trial court correctly admonished the jury, which usually cures any potential prejudice that may have resulted from unwarranted statements. *Strawhacker v. State*, 304 Ark. 726, 804 S.W.2d 720 (1991). Further, the defense offered no evidence that anyone, including the jury, actually saw the false gold tooth that the prosecutor improperly attempted to introduce during closing arguments. There is no doubt that what the prosecutor attempted to do was improper. However, that is not the test. Instead, this court must determine whether the trial court abused its discretion by denying the motion for mistrial because the argument was "so patently inflammatory that justice could not be served by continuing the trial" and the attempt was an improper "appeal to the jurors' passions." *Lee, supra; Puckett, supra.* That did not occur here. The trial court did not abuse its discretion.

### Rule 4-3(h) Compliance

In accordance with Rule 4-3(h) of the Arkansas Supreme Court Rules, the record has been reviewed for adverse rulings

objected to by Appellant but not argued on appeal, and no such reversible errors were found. For the aforementioned reasons, the judgment of conviction is affirmed.

Affirmed.