Scott Randall ROSS  *v.*  STATE of Arkansas

CA CR 05-1378                                                    242 S.W.3d 298

Court of Appeals of Arkansas
Opinion delivered November 1, 2006

*The Law Offices of Ables, Howe & Standridge, PLLC*, by: *J. Brent Standridge*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., for appellee.

SAM BIRD, Judge. Appellant Scott Randall Ross was convicted by a jury of first-degree murder and using a firearm during the commission of a felony. He was sentenced to consecutive terms of forty and fifteen years in the Arkansas Department of Correction. Ross raises four points on appeal: (1) that the trial court

erred in declining to instruct the jury regarding his proffered jury instruction concerning mental state; (2) that the trial court erred in permitting his prior bad acts to be admitted into evidence; (3) that the trial court erred in ruling that communications between Ross and his pastor were not privileged under Ark. R. Evid. 505; and (4) that the trial court erred in permitting marital communications to be admitted into evidence in violation of Ark. R. Evid. 504. We affirm.

On February 23, 2004, Ross was charged with the first-degree murder of Inocencio Cruz. According to the felony information, Ross was subject to an additional term of imprisonment for employing a firearm in the commission of a felony offense.

Prior to trial, Ross filed a motion to invoke religious privilege under Ark. R. Evid. 505 based on statements made to his friend Steve Long, who, like Ross, was an ordained minister. The trial court denied this motion after a hearing on the matter. Ross also filed a motion to invoke the husband-wife privilege pursuant to Ark. R. Evid. 504. Although the trial court concluded that certain communications between Ross and his wife were confidential,[1] it ruled that the confidentiality did not include Ross's act of handing a gun and a knife over to his wife on the night that Cruz was killed.

Ross made other motions prior to trial, including a motion in limine to prevent the State from asking witness Craig Adams about a cut on Ross's finger. The court granted this motion. Ross also moved to exclude evidence that he had previously carried a gun into a local bar. The court granted this motion as well, excluding any reference to guns aside from "those that have a causal relationship with this incident."

The evidence at trial revealed that, on the evening of January 17, 2004, a red sport- utility vehicle (SUV) rear-ended a vehicle being driven by Ross at the corner of Summer and Hobson in Hot Springs. According to witnesses, Ross became agitated after the accident and shot the driver of the red SUV.

Over objection from Ross, Ross's friend and fellow minister Steve Long testified that he was a disc jockey at Lucky's Bar in Hot Springs, and he saw Ross at Lucky's around 6:00 p.m. on January

---

[1] The court's specific ruling was that Ross was entitled to the Rule 504 privilege for "whatever communication was made" by Ross to his wife "during [a] van ride" on the night of the incident in question.

17, 2004. According to Long, Ross appeared to have a cut on his finger. Long said that Ross left Lucky's around 9:30 p.m. and returned around thirty to forty minutes later. At that time, Ross told Long that "there was an accident and a gentleman had smashed the back of [Ross's] car and . . . he had shot him." Long said Ross mentioned that he had shot the man five times and that the man might have been the "Antichrist."

Ross testified extensively about what happened on the night in question, explaining that he was drinking with friends at Lucky's and later obtained a gun at his mother's pawn shop with the intention of committing suicide. After he left the pawn shop, his vehicle was rear-ended by another vehicle. He said he remembered getting out of his car and talking to the other driver, but he did not remember exactly what happened. He claimed that he returned to Lucky's to talk to Long in "confidence," and he admitted that he told Long that he had killed a "Hispanic man or a Mexican."

Ross said that he then called his wife[2] and she came to pick him up. He said that he admitted to her that he had killed a "Mexican fella" and had shot him five times. Ross said that his wife dropped him off at a gas station and that he ended up at her house later in the evening. At that point, she asked him for the gun in his possession and for his pocket knife, because she knew that he always carried a pocket knife. Ross said that he gave these items to her. Ross was later arrested.

Following Ross's testimony at trial, the State cross-examined him about whether he had ever carried a gun into Lucky's before the night of the shooting. Ross objected, but his objection was overruled after the State argued that it was proper cross-examination based on Ross's testimony concerning his possession of a gun. The State also cross-examined Ross about what he had said to his wife after the shooting. Ross objected based on the court's earlier determination that these communications were confidential, but the State argued that the privilege had been waived by Ross's testimony. The court overruled Ross's objection.

Two of Ross's witnesses, Kim Ocker and Jay Schapiro, testified that Ross was not a violent individual. The State then

---

[2] According to Ross's brief on appeal, Ms. Ross had filed for divorce, but the matter was still pending.

provided a rebuttal witness, Craig Adams, who testified that, shortly before the murder, Ross cut his finger in a confrontation with some people and had slashed their tires.

The jury was instructed that the State had the burden of proof beyond a reasonable doubt on every element of every charge that it considered; the jury was also instructed on first-degree murder, second-degree murder, and manslaughter. The jury returned a verdict of guilty on the first-degree murder charge and also found that Ross employed a firearm as a means of committing the murder. On September 23, 2005, the trial court entered a judgment and commitment order convicting Ross of first-degree murder with a felony-firearm-sentence enhancement. He was sentenced to consecutive terms of forty and fifteen years in the Arkansas Department of Correction.

### Jury Instruction on Mental State

On appeal, Ross first contends that the trial court erred in refusing to instruct the jury concerning his proffered jury instruction on mental state. At the close of the State's case, Ross submitted the following instruction, which is a modified version of AMI Crim. 610:

> EVIDENCE THAT SCOTT ROSS SUFFERED FROM A MENTAL DISEASE OR DEFECT MAY STILL BE CONSIDERED BY YOU IN DETERMINING WHETHER SCOTT ROSS HAD THE REQUIRED MENTAL STATE TO COMMIT THE OFFENSE CHARGED OR MURDER IN THE SECOND DEGREE AND MANSLAUGHTER.

Our supreme court has held that a trial court should not use a non-model instruction unless there is a finding that the model instruction does not accurately reflect the law. *Calloway v. State*, 330 Ark. 143, 953 S.W.2d 571 (1997). Here, Ross claims that the proffered instruction essentially tracks Ark. Code Ann. § 5-2-303, which generally provides that evidence that a defendant suffered from a mental disease or defect is admissible to prove whether he had the kind of culpable mental state required for commission of the offense charged.

Ross argues that the court should have allowed the modified instruction because "in the context of this case, it was important for the jury to know, even though [Ross] was not asserting mental disease or defect as an affirmative defense to any crime, that [they]

could consider evidence of mental disease or defect in determining whether [Ross] had the requisite mental state necessary for the lesser-included offenses." He asserts that, based on the evidence, there was a jury question as to whether his mental state was diminished by mental disease or defect so that, while not constituting an affirmative defense, it could have shown that his mental state was less than that required for a first-degree murder conviction. He also claims that if the jury had been properly instructed in this case, then they could have convicted him of murder in the second degree or manslaughter.

In *Robinson v. State*, 269 Ark. 90, 95, 598 S.W.2d 421, 425 (1980), our supreme court rejected a similar argument, stating as follows:

> Appellant also contends that he was entitled to a specific instruction informing the jury that he had placed in issue his mental capacity to form the kind of mental state necessary to establish the commission of the alleged offense. Appellant grounds his contention on Ark. Stat.Ann. § 41-602 (Repl. 1977) [now codified as Ark. Code Ann. § 5-2-303] which permits the introduction of evidence of mental disease or defect to determine whether the defendant possessed the kind of culpable mental state required for the commission of the crime charged. However, we do not construe Ark. Stat.Ann. § 41-602 (Repl. 1977) as requiring an instruction of this nature. The statute simply clarifies any issue concerning the admissibility of mental disease evidence when it is less than persuasive in connection with an affirmative defense of insanity. Moreover, the essence of appellant's proffered instruction is effectively given when the court instructs the jury on the burden of the state to prove beyond a reasonable doubt each element of the offense, especially when such instruction is accompanied by an instruction on lesser included offenses.

■ In this case, as the State points out, the jury was instructed that the State had the burden of proof beyond a reasonable doubt on every element of every charge that it considered. The jury was also instructed on first-degree murder, second-degree murder, and manslaughter. In light of *Robinson, supra*, we reject Ross's argument and affirm on this point.

## Prior Bad Acts

Ross next contends that the trial court erred in permitting certain prior bad acts to be admitted into evidence. Specifically, he argues that "evidence of possessing firearms prior to and after the

night in question and evidence that he was involved in a confrontation resulting in a cut to his finger was offered to prove that he was of bad character and it was not independently relevant to the case." Ross claims that this evidence was introduced in order to make him "look bad in front of the jury" and, thus, should not have been admitted.

Trial courts have broad discretion in deciding evidentiary issues, and their decisions are not reversed absent an abuse of discretion. *Shields v. State*, 357 Ark. 283, 166 S.W.3d 28 (2004). In *Cook v. State*, 345 Ark. 264, 270, 45 S.W.3d 820, 823-24 (2001), our supreme court discussed Ark. R. Evid. 404(b), as follows:

> Arkansas Rule of Evidence 404(b) states:
>
> > (b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
>
> Evidence offered under Rule 404(b) must be independently relevant, thus having a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. *McGehee v. State*, 338 Ark. 152, 992 S.W.2d 110 (1999). The list of exceptions to inadmissibility in Rule 404(b) is not an exclusive list, but instead, it is representative of the types of circumstances under which evidence of other crimes or wrongs or acts would be relevant and admissible. *Williams v. State*, 343 Ark. 591, 602, 36 S.W.3d 324, 331 (2001).

In *Spohn v. State*, 310 Ark. 500, 503, 837 S.W.2d 873, 874-75 (1992), our supreme court further discussed Rule 404(b):

> It is true as a general rule that proof of other crimes or bad acts is never admitted when its only relevancy is to show that the accused is a person of bad character. Ark. R. Evid. 404(b); *see also Sweatt v. State*, 251 Ark. 650, 473 S.W.2d 913 (1971); *Alford v. State*, 223 Ark. 330, 266 S.W.2d 804 (1954). However, in *McCormack on Evidence*, the following statement of the law is made relative to character testimony:
>
> > Ordinarily, if the defendant chooses to inject his character into the trial in this sense, he does so by producing witnesses who

testify to his good character. By relating a personal history supportive of good character, however, the defendant ·may achieve the same result. Whatever the method, once the defendant gives evidence of pertinent character traits to show that he is not guilty, his claim of possession of these traits–but only these traits–is open to rebuttal by cross-examination or direct testimony of prosecution witnesses.

*McCormack,* Vol. I, § 190, p. 816 (1992).

■ Here, Ross's testimony that his wife requested the gun that he possessed and the pocket knife that he "always" carried opened the door to cross-examination by the State regarding whether he habitually possessed a weapon. Furthermore, Ross's testimony concerning his lack of intent to commit a violent act, together with the testimony by two of Ross's witnesses that he was not a violent person, invited inquiry into whether Ross cut his finger during an angry outburst shortly before the murder during which he slashed a vehicle's tire and injured himself. We affirm on this point.

### Rule 505 privilege

As his third point, Ross contends that the trial court erred in ruling that communications between him and his pastor were not privileged under Ark. R. Evid. 505. A person has a privilege to refuse to disclose and to prevent another from disclosing a confidential communication by the person to a clergyman in his professional character as spiritual advisor. Ark. R. Evid. 505(b); *Bonds v. State,* 310 Ark. 541, 837 S.W.2d 881 (1992). In reviewing a trial court's ruling on a motion to suppress, we make an independent determination based on the totality of the circumstances and reverse only if the decision is clearly against the preponderance of the evidence. *Bonds, supra.*

Here, Ross's friend Steve Long, an ordained minister,[3] testified that Ross was at Lucky's Bar around 6:00 p.m. on the evening of the shooting. Long said that Ross left around 9:30 p.m., then returned thirty to forty minutes later and told Long that "there was an accident and a gentleman had smashed the back of

---

[3] According to testimony, Long obtained an honorary degree from the Universal Life Church via the Internet in March 2003.

his car and that [Ross] had shot him." Long said that Ross mentioned that the man he had shot might be the "Antichrist."

■ It is the State's position that Long was not acting in the role of a spiritual counselor when Ross communicated with him, but was instead acting as a friend at a bar. In *Bonds, supra,* our supreme court addressed the issue of whether certain communications between a defendant and a witness — who was defendant's employer, brother-in-law, and friend — were subject to the religious privilege under Ark. R. Evid. 505. The court in *Bonds* found that there was no evidence of ongoing counseling between the witness and the defendant that the witness had agreed to keep confidential and concluded that the communications were not made to the witness in his capacity as a spiritual advisor. *Id.* Similarly, here, although Long was an ordained minister, he was also Ross's friend, and there was no evidence that Ross had communicated to Long with the expectation that Long would keep the communication confidential. We therefore hold that the trial court's decision concerning Ark. R. Evid. 505 was not clearly against the preponderance of the evidence.

Ross additionally argues that the admission of his communication to Long led to his (Ross's) testifying at trial; however, he offers no supporting authority as to why this would require reversal. We therefore will not address this argument on appeal. *See Hanks v. Sneed,* 366 Ark. 371, 235 S.W.3d 833 (2006) (refusing to consider appellant's argument where appellant offered no convincing argument or convincing authority to support his claim). Moreover, any error in admitting the testimony was harmless, because Ross himself testified about what he said to Long. We therefore affirm on this point.

### Rule 504 privilege

Ross's final point is that the trial court erred in permitting marital communications to be admitted into evidence in contravention of Ark. R. Evid. 504. Specifically, Ross claims that the State should not have been permitted to cross-examine him about a statement to his wife on the night of the shooting that he was "going to take money from a Mexican," because he did not specifically testify to this.

■ Rule 504(b) states that an accused in a criminal proceeding has a privilege to prevent his spouse from testifying as to any confidential communication between the accused and the

spouse. However, as the State points out, Ark. R. Evid. 510 states that a person waives this privilege if he "voluntarily discloses or consents to disclosure of any significant part of the privileged matter." At trial, Ross testified extensively about what he said to his wife on the night of the shooting. This was clearly a voluntary disclosure of a "significant part of the privileged matter" under Rule 504. We therefore agree with the State that Ross's testimony constituted a waiver of the Rule 504 privilege in this case. Furthermore, Ross could not use the trial court's initial ruling to exclude the marital communications as a means to commit perjury by way of a defense. The State was certainly entitled to cross-examine Ross as to his version of what he disclosed to his wife on the night of the shooting. *See Rooks v. State*, 250 Ark. 561, 466 S.W.2d 478 (1971) (holding that it was permissible for the State to test the credibility of appellant's trial testimony by cross-examination). We therefore affirm on this point.

As for Ross's argument that the trial court erred in ruling that his handing of the gun and knife to his wife was not protected by the Rule 504 privilege, we hold that Ross has failed to demonstrate any prejudice as a result of this. There was other overwhelming evidence of Ross's guilt in this case, including eyewitness testimony that Ross committed the murder and evidence that Ross admitted to both his wife and his friend Steve Long that he committed the murder. Because we cannot see how Ross was prejudiced by the trial court's decision on this matter, we will not reverse. *See Gaines v. State*, 340 Ark. 99, 8 S.W.3d 547 (2000) (recognizing that no prejudice results where the evidence erroneously admitted was merely cumulative, and an appellate court will not reverse for harmless error in the admission of evidence).

For these reasons, we affirm.

GLADWIN and ROAF, JJ., agree.